UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
UNITED STATES OF AMERICA                    14 Cr. 227 (RA)
                 -against-

FRANK PERKINS HIXON, JR,
                 Defendant
-------------------------------------------------------------- X


## SENTENCING MEMORANDUM OF FRANK PERKINS HIXON, JR.


King & Spalding LLP
1185 Avenue of the Americas
New York, New York 10036-4003
Telephone: 212-556-2100


*Attorneys for Defendant Frank Perkins Hixon, Jr.*

**Table of Contents**

PRELIMINARY STATEMENT ..................................................................................1

I. STATEMENT OF FACTS ...............................................................................2

   A. Mr. Hixon's Personal History and the Nature of his Conduct ............................2

      1. Mr. Hixon's Personal History and Characteristics ..................................2

      2. The Offense Conduct and Applicable Sentencing Guidelines....................8

      3. The Nature of Mr. Hixon's Conduct and its Underlying Causes.................9

   B. Mr. Hixon's Life Since His Arrest.................................................................15

II. ARGUMENT .................................................................................................16

   A. A Review of the Section 3553 Factors Weighs in Favor of a Sentence Below Mr. Hixon's Calculated Guidelines Range ..................................................................16

      1. Seriousness of the Offense and History and Characteristics of the Defendant...........16

   B. Deterrence from Criminal Conduct ...............................................................17

      1. Protection of the Public from Further Crimes of the Defendant.................18

      2. Avoidance of Unwarranted Sentence Disparities ........................................19

      3. Restitution to Victims of the Offense and Financial Considerations.........22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*,
128 S. Ct. 586 (2007) ................................................................................................16

*Lugosch v. Pyramid Co.*,
435 F.3d 110 (2d Cir. 2006) .........................................................................................2

*United States v. Adelson*,
441 F. Supp. 2d 506 (S.D.N.Y. 2006) ...................................................................17, 18

*United States v. Brownstein*,
No. 11 Cr. 904 (RPP) ................................................................................................19

*United States v. Chiesi*,
No. 09 Cr. 1184 (RJH) ...............................................................................................20

*United States v. Emanuel Goffer*,
No. 10 Cr. 56 (RJS) ...................................................................................................22

*United States v. Gansman*,
No. 08 Cr. 471 (MGC) ...............................................................................................20

*United States v. Gupta*,
No. 11 Cr. 907 (JSR) .................................................................................................21

*United States v. Kurland*,
No. 10 ......................................................................................................................22

*United States v. Longueuil*,
No. 11 Cr. 161 (JSR) .................................................................................................20

*United States v. Madden*,
No. 09 Cr. 799 (RWS), 2011 WL 4359933 (S.D.N.Y. Sept. 19, 2011) ........................22

*United States v. Newman et al*,
No. 12 Cr. 121 (RJS) .................................................................................................21

*United States v. Whitman*,
No. 12 Cr. 125 (JSR) ............................................................................................19, 20


**Statutes**

18 U.S.C. § 3553(a)(1) – (7) .................................................................................. passim

U.S.S.G. § 2B1.4(a) ......................................................................................................9

U.S.S.G. §§ 2B1.4(b)(1) and 2B1.1(b)(1)(H) ..................................................................9

U.S.S.G. §§ 2J1.2(c)(1) and 2X3.1(a) ............................................................................9

U.S.S.G. § 3B1.3 ...........................................................................................................9

U.S.S.G. § 3C1.1 .................................................................................................................9

U.S.S.G. § 3C1.1 & cmts. 5, 8 ...........................................................................................9

U.S.S.G. § 3D1.2(c) ............................................................................................................9

U.S.S.G. § 3E1.1(a) ............................................................................................................9

U.S.S.G. § 3E1.1(b) ............................................................................................................9


**Other Authorities**

58 Stan. L. Rev. 67, 80 (Oct. 2005) ..................................................................................17

United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing*
    (2004).............................................................................................................................18

## PRELIMINARY STATEMENT

Defendant Frank Perkins Hixon, Jr. ("Mr. Hixon" or "Hixon") respectfully submits this memorandum in aid of his sentencing.  Although the Presentence Report ("PSR") includes a description of Mr. Hixon's background and offenses, we submit this memorandum to provide additional detail regarding these matters, so that the Court will have a full picture of Mr. Hixon's life to compare with the conduct that brings him before the Court.  We respectfully submit that Mr. Hixon is materially different from other defendants.  In the final analysis, the actions that bring Mr. Hixon before the Court at sentencing stem not from the usual motives of financial crime -- greed and status -- but rather from deeply human instincts: love and fear.  Mr. Hixon's actions were a misguided expression of love and support for his younger daughter, whom he desperately feared losing.  Because Mr. Hixon truly stands apart from others who have been convicted of insider trading offenses, we respectfully submit that a sentence  below Mr. Hixon's calculated range pursuant to the U.S. Sentencing Guidelines ("Guidelines") is appropriate.

The record demonstrates that Mr. Hixon's conduct in this case, although serious, was an aberration in an otherwise exemplary life.  Mr. Hixon had never been in trouble with the law before engaging in the criminal conduct to which he pleaded guilty, and he has demonstrated excellent character in all other aspects of his life, including extensive support of friends and family, as well as substantial charitable giving.  We urge the Court to consider, and give effect to, the letters submitted on Mr. Hixon's behalf that illustrate his thoughtful and strong parenting, his unwavering support of family members, his commitment to education and the arts, and his reinforcement of those beliefs through targeted and thoughtful financial giving.  His absence from the lives of his family would be devastating, particularly to his younger daughter, who is now five years old and thrives under his support, and to his father, who is in poor health and advancing in age.  Mr. Hixon's wife and older daughter also need Mr. Hixon in their lives.  We urge the Court to weigh the seriousness of Mr. Hixon's conduct and the profits gained thereby against the non-financial motivations therefor, as well as the harm that his absence would cause his family and those who depend upon him for so many things.

# I.   STATEMENT OF FACTS

**A.   Mr. Hixon's Personal History and the Nature of his Conduct**

### 1.   Mr. Hixon's Personal History and Characteristics

Mr. Hixon grew up in a middle class family in rural Alabama and Tennessee as the oldest of four children.  The family's relocation to rural Tennessee was difficult; Mr. Hixon's father was required to travel extensively for work, and Mr. Hixon's ███████████ ████████████████████████████████████████████████.  As a result, Mr. Hixon took on a parental role with his younger siblings – providing not only emotional but also practical support, such as preparing their meals and getting them ready for school in the mornings.  Letter of Perk Hixon, attached as Exhibit 1.  *See also* Letter of Darlene ████[1], attached as Exhibit 5, and Letter of Kathleen ███████, attached as Exhibit 6.  Mr. Hixon was not always able to be there for them because his parents separated him from his siblings and sent him to live with his grandfather during the summers.  Letter of Julie ████ █████ attached as Exhibit 21.

One of Mr. Hixon's sisters describes her childhood with her brother:

> All my life I have experienced such unconditional love from my brother. We would argue as all siblings do, but I knew how much Perk loved my sister, my brother and me.  We had a difficult upbringing. ████████████ ██████████████████████████████ Perk, as the oldest, cared so much for us. In a very often verbally abusive home Perk kept our self-esteem up and helped us to feel loved and appreciated. Now that I have raised my own sons I realize even more what an incredible responsibility Perk had at an early age.

Letter of Kathleen ███████, attached as Exhibit 6.  Mr. Hixon's other sister echoes those sentiments and states that:

> Though Perk was always looking out for us, you really had to know him well to know how deeply he cared for his family. He feels very deeply but does not

---

[1]   We have redacted references to certain individuals and subject matter in the publicly-available version of this sentencing memorandum based on privacy concerns, but there is no redaction in the versions submitted to the Court and to the government.  We respectfully request the Court's permission to retain the redactions contained within the publicly-available version of this sentencing memorandum because they contain identifying last names, medical history, and other personal and biographical information that is deserving of privacy protection. *See Lugosch v. Pyramid Co.*, 435 F.3d 110, 120, 2006 (2d Cir. 2006) (courts must balance competing considerations against the weight of the presumption of access to judicial documents, and such countervailing factors include but are not limited to "the danger of impairing law enforcement or judicial efficiency" and "the privacy interests of those resisting disclosure.").

always show it on the outside. This could possibly be attributed to our mother who was not a very warm person.  She loved us but she had emotional issues. Where many children have mothers who exhibit unconditional love, our mother was very difficult to please and often said very cruel things to us. Our father traveled for business and for years was on the road Monday - Friday.  This was hard on our mother and she did not take it well. The four of us would gather in our basement level playroom at our house and discuss Mom's latest cruel verbal attack. I think, as much as Perk tried to act like her words did not hurt, I'm sure they did.

Letter of Melanie ▮▮▮▮▮▮, attached as Exhibit 10.

Mr. Hixon's brother also speaks to the protective role that he played in his life, and how he continues in that role to this day:

Perk was also my protector. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ While I was not completely removed by any means, over the years I learned what Perk did to shield, diminish, deflect, or anything he could do to protect me from the brunt of this reality. It was a 24/7 effort, aside from all of his other accomplishments. Even today, as a fifty-year-old man, it is difficult to imagine what it took to have this strength of character at such a young age…

[A]fter Katrina, Perk flew to Montgomery where he borrowed our cousin's truck. He drove to New Orleans bringing food, water and supplies. He arrived as the first outsiders were being allowed to enter. He helped clean up my house, as well as my in-law's and my neighbor's. For three nights, he slept outdoors on my patio on a deck chair. With everything secure as could be, he drove my son and daughter to Jackson so they could stay with my sister.

Letter of Neal ▮▮▮▮▮, attached as Exhibit 7.

Formed by his childhood circumstances, Mr. Hixon has continued in the role of "protector" throughout his adult life, both with friends and family.  Mr. Hixon's mother-in-law and sister-in-law both describe how Mr. Hixon provided for his in-laws after their retirement and how he was a source of emotional support to his mother-in-law when his father-in-law passed away.  Letter of Dorothy ▮▮▮▮, attached as Exhibit 23, Letter of Catherine ▮▮▮▮▮, attached as Exhibit 17, and Letter of Peter ▮▮▮▮▮ attached as Exhibit 24.  His sister writes:

Perk has been the protector of the family. He has cared for my father through very trying times and supported my younger brother emotionally and financially. He takes care of everyone when needed. My father, I feel sure, would not have survived caring for my mother in the last years of her life without all Perk did for him. My mother's illness was so stressful for the whole family but particularly for my Father. Perk has always had a close relationship with Dad and did so much to make things bearable for him.

Letter of Kathleen ████████, attached as Exhibit 6.

Another common theme throughout Mr. Hixon's life is his absolute devotion to his children. A friend describes Mr. Hixon as an "exceptionally present, kind, patient, loving, and engaged parent," and states how she asked Mr. Hixon and his wife Marguerite to be the legal guardians of her daughter in the event of her death, adding that "I have never considered than [sic] I could trust anyone more than I do them." Letter of Ann ████, attached as Exhibit 25. A close friend to the Hixons, and mother of two daughters, states that:

> [S]ummer weekends with the Hixons provided a wonderful opportunity to appreciate Perk's role as a father. Perk is very much a 'present' father: keenly interested in and respectful of J.'s interests and talents, without co-opting them. He has encouraged and supported her as those interests have blossomed, whether in active imaginative play in the early years or in more serious intellectual discourse as she has grown into a young adult. I will say it was quite a sight to witness him collapse his long limbed frame into a child's play house and proceed to have an animated pretend tea party. It has been so touching to see his pride as J. has grown into an accomplished young woman - he always shares stories with a quiet wonder and a deep appreciation for the unique and special person that she is.

Letter of Ann ████ attached as Exhibit 26. Another close friend of the Hixons describes Mr. Hixon's relationship with his older daughter J. in her letter:

> If there is one element of his personality that I would like to bring forward and underline, it is his constant attention towards, affection for and pride in his daughter, J. It may be stereotypical of a father with his baby girl. but in this family, there is no doubt about it, he loves his offspring and consistently does his best to be a good father, taking care of his daughter every step of the way, making sure that she is on the right path, ensuring her well-being. You can tell just by looking at and talking with J. that she is a daughter who is loved. And thanks to the love and attention of her parents, she has blossomed at every step as she moves through life.

Letter of Linda ████████, attached as Exhibit 27. Mr. Hixon's wife makes clear that he has always placed great importance on being present for his children:

> Family meals are an important part of this, and Perk made sure that he was home for breakfast and dinner when he was in town, often working from home early in the morning and late at night. He never missed a school play, piano or orchestra concert, or parent-teacher conference. And when he did travel, he called, morning and evening, to hear about our days, and to tell us about his.

Letter of Marguerite ████████, attached as Exhibit 2. J.'s describes her close relationship with her father in her thoughtful and articulate letter, attached as Exhibit 4.

Other parents have observed Mr. Hixon's parenting of his younger daughter.  The mother of one of his younger daughter's classmates states:

> Mr. Hixon "was always flying in to spend time with his daughter and if you didn't know any better, you would think he lived here in Austin!  I have a very high opinion of Mr. Hixon and believe he is an exceptional parent to M. …[s]ince M. has graduated to elementary school, our daughters have continued to be friends and we are often lucky enough to spend time with Mr. Hixon and his daughter. They have a special bond and he never misses an event. He is a constant presence in her life, whether it be school functions, violin performances, science fairs, birthday parties, or parent/teacher conferences ... he is always there.
>
> When he speaks of M., he speaks of the future. He looks forward to being there when she starts reading her next chapter book, looses [sic] her baby teeth, rides her bike without training wheels, and asks hard questions only a daddy can answer… M. is a very lucky little girl. Her father is kind, loving, and completely devoted to her … [b]ecause of this unconditional love, M. is a confident, compassionate and bright young girl. I fear that significant time spent away from her father could impact her greatly, as they are so close.

Letter of Kerry ███ attached as Exhibit 11.  The founder and Executive Director of M.'s preschool in Austin, Texas, describes Mr. Hixon as a frequent visitor to M.'s school, despite its distance from New York:

> During M.'s time at ███ Perk was a caring, connected, and involved parent, even though he lived out of town. He was in Austin frequently, and would drop-off and pick-up M., and would visit her classroom and teachers. He came to town for special occasions to celebrate M.'s academic achievements. Whenever he was here, he would stop by the office to visit with me about M.'s interests and progress. He enjoyed talking about M.'s development and the possibilities for her future education.

Letter of Lisl ███ attached as Exhibit 19.  M.'s preschool teacher expands on Mr. Hixon's attention and devotion to M.:

> Throughout the time I have known Perk he has been a very involved and caring father. Perk attended every parent teacher conference and school event for M.. He was in regular communication with me about M.'s day to day progress. Perk picked M. up from school on a regular basis, despite living in New York. He made several trips per month to see her and she absolutely loves her daddy. Perk donated many books to our classroom and was excited about the curriculum and M.'s reading skills. He is a particularly kind and loving father, that really knows and adores his daughter. He lights up when speaking of her, and their very close bond is apparent when they interact. Seeing M. and Perk together is

heartwarming. I feel strongly that he is an integral person in sweet M.'s life and should continue to be able to be a consistent father for her.

I hope you consider this information in regards to the charges Perk is facing. I want it to be known that Perk is an amazing father and person, and sending him to prison will harm more than it will help. M. loves and needs her daddy; my wish for her is that she will not have to endure the emotional trauma from losing him in her life.

Letter of Susanne ████████ attached as Exhibit 8.  Another parent of a classmate of M.'s speaks to Mr. Hixon's deep involvement in her life:

Another small story speaks volumes. Recently the Kindergarten class presented its Bug Fair. Each girl was assigned a specific insect to research and prepare a presentation. I was happy to see Perk that day and, watched him as he instinctively walked around the room visiting each and every girl, listened to their speeches and asked questions. Every girl was delighted to give their pitch and receive his attention. M.'s face was priceless. She was so full of joy as she watched her dad. I learned something about being a father that day.

Letter of John ██████ attached as Exhibit 12.

Nicole Robinson, the mother of Mr. Hixon's younger daughter, has perhaps the closest view of Mr. Hixon's parenting of their daughter.[2]  In her letter, Ms. Robinson stresses that Mr. Hixon has remained a constant in the life of their daughter from the moment Ms. Robinson told him she was pregnant, saying that "Perk has been devoted to M. from the start," and that he has always played an important role in M.'s life, helping Ms. Robinson care for their daughter not merely by financial means, but more meaningfully with his time and love for M.  Ms. Robinson elaborates:

Perk's dedication to M. is amazing.  Perk speaks with M. every day.  On weekdays, Perk calls M. every morning during the 20 minute drive to her school. He and M. chat about whatever is on her mind.  They create word games and math quizzes.  He always gives her a pep talk about the school day.  On weekends, they Skype in the early morning, allowing me to sleep in.

Letter of Nicole Robinson, attached as Exhibit 3.

Mr. Hixon's connection with M. is truly important to him, and making sure she is happy and loved has been one of the imperatives in his life since before she was born:

---

2    Ms. Robinson's birth name is Destiny Wind Robinson, but she is referred to herein as "Nicole" or Ms. Robinson, as that is the name by which Mr. Hixon regularly referred to her.

> When they swaddled her and gave her to me I promised her I would always protect her, just as I had promised J. at her birth.
>
> * * *
>
> I couldn't stand the thought that M. might not think I loved her or wanted to see her, and made sure to let her know she was loved.  I knew from my own upbringing that the lack of a good parental connection can be devastating to a child, and I was determined not to let that happen to M..

Letter of Perk Hixon, attached as Exhibit 1

The selected photographs of Mr. Hixon and M. together vividly illustrate the bond between Mr. Hixon and M. and M's sheer joy in spending time with her father.  See Photographs attached as Exhibit 28.  She is truly thriving thanks in no small part to the role Mr. Hixon has played throughout her entire life.

In addition, throughout his life, Mr. Hixon has been committed to the people in his community and has done a great deal to assist others through his activities with charitable organizations and through personal charity.  For example, the President of the Atlanta Downtown Improvement Office remembers the help Mr. Hixon provided him in connection with establishing the National Center for Civil and Human Rights in Atlanta, Georgia.  Letter of A.J. ▇▇▇ attached as Exhibit 29.

Mr. Hixon also played an important role in the reconstruction and revitalization of the New Orleans Lower Garden District following the devastation of Hurricane Katrina in 2005 through his business dealings with the Arabella Station project.  Mr. Hixon also led the renovation of the Joy Theatre on Canal Street in New Orleans, reopening the Theatre in 2012 and then donating his ownership to the Joy Theatre Association itself.  Letter of Chris ▇▇ and Letter of Lee ▇▇▇▇ attached as Exhibits 30 and 31.  In 2005, in the immediate aftermath of Hurricane Katrina, Mr. Hixon personally traveled to New Orleans to be among the first non-emergency individuals to return to the city and provide assistance to his brother, as well as others in need.  Letters of Lee ▇▇▇▇ and Neal ▇▇▇, attached as Exhibits 31 and 7.

Mr. Hixon has also played a vital role in the management of his apartment co-op over the past nineteen years as an officer on its board, enabling the building's revenue stream from its commercial space to grow large enough to cover all maintenance costs for the building and to considerably ease the financial burden on its residents:

> Perk has been a highly conscientious and responsible member of our board…[h]e has helped steer us on a prudent financial path, avoiding profligate borrowing and any spending that was potentially beyond our reach.  He has been a very dependable colleague on the board, often seeking to attend by phone even when business took him to far-flung destinations.
>
> * * *
>
> I am always impressed when people of wealth manifest real concern for the well-being of those with lesser means. Perk has repeatedly demonstrated this sensitivity by periodically lending the coop personal funds when major renovation projects would otherwise have required large special assessments, which some of the owners, including artists and photographers, could not have managed.

Letter of Guido ███████ attached as Exhibit 32.

Mr. Hixon and his wife Marguerite have been steady and sizeable contributors to numerous charitable organizations over the past 10 years, donating more than $6 million (in the past ten years alone) to organizations such as CUNY Graduate Center, Prep for Prep (a leadership development and gifted education program), the Woodruff Arts Center in Atlanta, GA, The Watch Hill Chapel Society, Westerly Hospital, the South County Women's Shelter, the Metropolitan Museum of New York City, Harvard University, and the Brearley School for Girls. In addition, Mr. Hixon and his wife have served on the boards of Concord Academy, Diller Quaile, and the Metropolitan Opera (serving on the Met's Finance and Audit Committees), giving substantial amounts of their time to serve these institutions.  See, e.g., Letters of Briana ███████ Barbara ███████ Jamie ██████████████, and Marita ███████ attached as Exhibits 15, 14, 33, and 34.

Mr. Hixon and his wife find their involvement with a Harvard scholarship fund particularly rewarding, as it allows them to provide full scholarships to two to three undergraduate students per year who would otherwise be unable to attend such a prestigious institution.  They are regularly involved with the selection of candidates and maintain contact with past recipients of aid.  The foregoing background is markedly at odds with Mr. Hixon's offense conduct, as will be explained in more detail below.

2.   **The Offense Conduct and Applicable Sentencing Guidelines**

As he admitted during his guilty plea before the Court, Mr. Hixon used confidential information regarding pending tender offers of Titanium Metals and Westway learned in the course of his employment at Evercore Partners ("Evercore") to engage in insider trading in an

account belonging to the mother of his younger daughter, as well as purchasing shares of Evercore based on material non-public information regarding Evercore's fourth quarter earnings for 2012.  Mr. Hixon also caused his father to purchase shares of Titanium Metals and Evercore Partners during the same time.  In addition, when questioned by FBI agents about purchases relating to these stocks, Mr. Hixon knowingly made a false statement to conceal his misconduct.

Pursuant to U.S.S.G. § 2B1.4(a), Mr. Hixon's base offense level is eight.  Because the gain resulting from the insider trading offenses was between $400,000 and $1,000,000, 14 levels are added thereto, pursuant to U.S.S.G. §§ 2B1.4(b)(1) and 2B1.1(b)(1)(H).  Because Mr. Hixon abused a position of private trust in a manner that significantly facilitated the commission of the offenses, two levels are added. *See* U.S.S.G. § 3B1.3.  By his false statement, Mr. Hixon willfully obstructed the investigation of his offenses, and pursuant to U.S.S.G. § 3C1.1, comment 8 thereto, and U.S.S.G. § 3D1.2(c), his false statement count is grouped along with his insider trading counts.  Because the offense level for the false statement under U.S.S.G. §§ 2J1.2(c)(1) and 2X3.1(a) is less than the resulting offense level for the five insider trading counts, as increased by an obstruction-of-justice adjustment imposed pursuant to U.S.S.G. § 3C1.1, the offense level for the entire group comprising all six counts is increased by two levels. *See* U.S.S.G. § 3C1.1 & cmts. 5, 8.

Finally, as Mr. Hixon has demonstrated his acceptance of responsibility through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction is warranted, pursuant to U.S.S.G. § 3E1.1(a).  Furthermore, because Mr. Hixon gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b).

3.     **The Nature of Mr. Hixon's Conduct and its Underlying Causes**

There is no question that Mr. Hixon's  insider trading was serious.  Mr. Hixon traded on his knowledge of material, non-public information gained in the course of his employment and violated the duties he owed to his clients and employer.  All of this was unacceptable and wrong.

In the history of this District Court alone,  many defendants  have been convicted of trading on inside information gained from their employer.  But the conduct involved in this case did not stem from the motivations typical of most insider trading cases.  It was not based on a desire to outperform competitors, to achieve a higher salary or bonus, or to improve business

reputation.  It was also not done to generate much needed money to pay for a mortgage, survive the loss of a job, or help meet a sizable expense.  Though the insider trading was, by definition, related to Mr. Hixon's professional life, it was only tangentially related and was not an integral part of his business activities.  Mr. Hixon's conduct is not a further example of the recent rash of insider trading cases in this District.  Where other defendants committed their crimes to gain money or status, Mr. Hixon committed his crimes in order to maintain a connection with his younger daughter and remain a part of her life.

Although at first this reasoning may not seem like the most obvious of causal connections, we believe that the background of Mr. Hixon's childhood and his relationship with his younger daughter, M., will explain the connection.  It does not excuse his actions, but it does explain and, we submit, serve to mitigate them.  As the Court is now aware, this case is distinctive.  But the unique nature of the case sets Mr. Hixon apart from the other defendants who have engaged in insider trading, and, we respectfully submit, that distinction should carry forward to his sentence.

Mr. Hixon committed a financial crime for non-financial reasons.  He committed the crime of insider trading not out of greed, but out of a very misguided attempt, not to provide for his daughter M., but to maintain contact with her.  At first blush, Mr. Hixon's behavior only makes sense from a financial angle, and some have suggested Mr. Hixon's conduct was some sort of child support, but that is simply not true.  Mr. Hixon had ample means to provide, and has always provided, substantial financial resources for the benefit of his younger daughter.  Mr. Hixon's financial ability to provide for his younger daughter cannot be challenged.  But while the size of Mr. Hixon's bank account would allow him to write a check, ultimately Ms. Robinson's personal pride prohibited that simple route.  As explained in Mr. Hixon's letter, although Ms. Robinson had previously permitted Mr. Hixon to supplement her income with periodic checks, in approximately 2011, Ms. Robinson generally refused to accept any further money for her benefit (as opposed to the benefit of M.).  Letter of Perk Hixon, attached as Exhibit 1.

Mr. Hixon's psychiatrist, Dr. Jack ██████ states that



10



Letter of Dr. Jack ████████ attached as Exhibit 18.  Mr. Hixon began seeing his psychiatrist in

2011 to help ██████████████████████████████████████████████████████████████

████████████████.

     Mr. Hixon's sister-in-law also describes her impressions of Mr. Hixon's motivations in

her letter:

> I have seen his determination to be the best, most involved father he can be with
> his daughter (and my niece), J., and I know he now feels the same way about his
> new daughter, M.. To have the scepter [sic] of the possible loss of M. raised
> during the illness and death of his mother and its aftermath, while maintaining a
> heavy work load, and travel schedule must have created a psychological "perfect
> storm" for him. That's my reasoning for behavior like <u>nothing</u> I have seen in my
> 30 year knowledge of Perk.

Letter of Catherine ████████, attached as Exhibit 17.

     For the Court's benefit, we will back up and relate the chronology relevant to Mr.

Hixon's younger daughter in more detail.  Beginning in 2005, Mr. Hixon engaged in an

extramarital affair for approximately two years with Ms. Robinson.  On learning that Ms.

Robinson had become pregnant with M., Mr. Hixon ended the romantic affair, but was adamant

in maintaining a relationship with his then unborn daughter.  He arranged medical care for Ms.

Robinson during her pregnancy and provided for her living expenses in New York City.  After

M.'s birth, Mr. Hixon would spend almost every evening with her and would frequently visit Ms.

Robinson's apartment in the mornings before he went to work to make M. breakfast and play

with her.  Letter of Perk Hixon, attached as Exhibit 1.

In January 2010, Ms. Robinson made the decision to leave New York City and move to Austin, Texas.  The distance between Mr. Hixon and his daughter, combined with the tumultuous nature of the relationship between Mr. Hixon and Ms. Robinson, served to fuel Mr. Hixon's anxieties about being able to maintain a relationship with M.  Through Mr. Hixon's counseling sessions with Dr. ████ Mr. Hixon has come to realize that his sensitivity to and fear of separation and abandonment were formed during his difficult childhood, and that it was those fears that catalyzed Mr. Hixon's behavior in this case.  Letter of Perk Hixon, attached as Exhibit 1.

Perhaps the most substantial contributor to Mr. Hixon's fears was Ms. Robinson's background.  Ms. Robinson's childhood was a difficult one; she grew up destitute in a family that belonged to a counter-culture group of missionaries that traveled frequently around the world, never staying longer than several years in one country or location.  It was a hard childhood, and it hardened Ms. Robinson.  Ms. Robinson's family moved at least four times before she was 16 years old, from New Zealand to Malaysia, to Indonesia, and then to Thailand, before her mother was finally able to break free and bring her eight children back to the United States.  Letter of Nicole Robinson, attached as Exhibit 3.  As a result, Ms. Robinson did not develop the close connections within a community that some are fortunate to develop, but rather became more connected to ex-members of the group such as herself, rather than neighborhood friends, school friends, or family members.

As such, Ms. Robinson would frequently become frustrated with her living situation in New York and Austin, not feeling comfortable in her surroundings and wanting to move somewhere – anywhere – else.  And her few trusted connections were almost all to fellow ex-members of the group, who themselves lived "off the grid" in isolated locations across the country and the world.  Letter of Perk Hixon, attached as Exhibit 1.  Accordingly, when she would speak to Mr. Hixon about the possibility of moving from Austin to somewhere else, she would invariably raise such locations as possibilities.  This terrified Mr. Hixon, who feared, more and more, that he could easily lose M. if that happened.  This potential loss of a connection to his daughter was the principal motivating factor behind Mr. Hixon's behavior, but it should not be construed to reflect negatively on Ms. Robinson's role as a mother to their daughter.  Indeed, the love and devotion that Ms. Robinson bears for their daughter has always been clear to Mr. Hixon and anyone else who has seen them together.  Letter of Perk Hixon, attached as Exhibit 1.

Ms. Robinson speaks to these issues from her own perspective in the letter she has submitted to the Court:

> I feel that I should mention that Perk has remained a strong, steady force in M.'s life despite the sometimes turbulent interactions between Perk and I.  The transition to Austin was very difficult for me for a number of reasons.  Holidays were particularly hard.   At times I became very emotional with Perk, even going so far as blocking his calls.  I told him that I thought a fresh start somewhere else might be best for me and M., and I considered moving to Colorado or California, where I have friends.   Despite bearing the brunt of my frustrations, Perk's devotion to M. was and continues to be unwavering.

Letter of Nicole Robinson, attached as Exhibit 3.

The pressure of Mr. Hixon's fears and anxieties about maintaining contact and interaction with his younger daughter during her formative years began to mount.  The traumatic loss of his mother in June 2011, and his father's increasingly serious health issues, combined with his work schedule, pushed Mr. Hixon even further.  Mr. Hixon's wife Marguerite describes Mr. Hixon's predicament and reaction well:

> Unfortunately, in these actions he saw something he could do.  They were actions he could take, and in his self-isolation, in which he believed that not only was he at risk of losing access to M., but that she was at risk of losing access to her father, and of growing up thinking he had deserted her, in which he believed he had exhausted other avenues; in which he was unable to communicate with the person in control; in which he was in that fatal frame of mind when we believe we need to do something and do it now – he did them.

Letter of Marguerite ████████, attached as Exhibit 2.

Through extensive psychiatric sessions with Dr. ██████ Mr. Hixon later came to understand his subconscious thinking back at the time – i.e., that mere financial assistance, cutting a check, for example, would not be enough to hold on to M.  Letter of Perk Hixon, attached as Exhibit 1.  After all, Ms. Robinson had earlier refused to accept checks from Mr. Hixon that were not limited to expenses related to M. (see Letter of Nicole Robinson, attached as Exhibit 3), and she had previously repeatedly raised the possibility of restricting Mr. Hixon's access to M.  He then subconsciously rationalized that he could attempt to provide Ms. Robinson with the expertise that he had, that is, the knowledge and skills he had gained through his experience in the financial industry, as a means of providing increased support and comfort for Ms. Robinson in a form she would find acceptable, consistent with her pride.  Mr. Hixon discussed stock investment strategies in general with Ms. Robinson, and she sometimes

purchased and sold stock based on those discussions.  Separate and apart from this legitimate investment advice and counseling that Mr. Hixon gave to Ms. Robinson, on the isolated occasions outlined in the charges here, something sparked Mr. Hixon himself to make certain purchases in her account based on non-public material information gained in the course of his employment.

Ms. Robinson was unaware of the basis on which Mr. Hixon made the illegal trades.  But those trades were an attempt to allow Mr. Hixon to maintain a connection to his daughter that was more acceptable to Ms. Robinson because she understood them to be based on Mr. Hixon's financial experience – which was materially different than had Mr. Hixon simply written a check to Ms. Robinson for the same amount of the profits from the trades.  Her pride would allow her to accept his investment ideas, but not his checks.  Ms. Robinson allowed Mr. Hixon to see M. frequently during the period from 2011-2012, when he made approximately 60 trips to Austin in a year-and-a-half.  This enabled him to be a present father to M. and enabled him to help Ms. Robinson set their daughter up in excellent schools and put her on a path to success.

The final motivating factor for Mr. Hixon's conduct was another family member – this time his own father.  As a result of his sessions with Dr. ████ Mr. Hixon has come to realize that causing his unwitting father to buy the same stocks he had traded in Ms. Robinson's account, although initially illogical, becomes clearer when viewed from the angle of family connections.  Mr. Hixon feared losing his connection to his daughter, and he also feared that his father, elderly and infirm, might pass away without ever meeting her.  Letter of Perk Hixon, attached as Exhibit 1.  The fact that Mr. Hixon caused his father to buy the same stocks that he traded in Ms. Robinson's account, is the subconscious product of that connection that was missing in his life – the connection between his younger daughter and his father.  As was the case with Ms. Robinson, Mr. Hixon's father also did not know the illegal basis for Mr. Hixon's causing his father to purchase the stocks.  Although Mr. Hixon wishes these events never happened, his mistakes did have the effect his subconscious thoughts conceived: Mr. Hixon was finally able to share M. and his love for her with his father and his other family members.  Mr. Hixon's father underscored  the significance of the connection Mr. Hixon so desperately sought when Mr. Hixon's father first saw a picture of M. and was immediately struck by her resemblance to Mr. Hixon's mother.  Letter of Frank Perkins Hixon, Sr., attached as Exhibit 13.

This resemblance of M. to Mr. Hixon's mother is a phenomenon that brings him to tears when discussing it.

Mr. Hixon also admits that he made a false statement to FBI agents when they confronted him unexpectedly about the trading in question.  That reflexive, but improper and unlawful, response was a further manifestation of his attempt to hold onto his relationship with his daughter M., by concealing the very connection between his unlawful trading and M. herself.

The circumstances described above – Mr. Hixon's childhood infected with fear and abandonment issues, Mr. Hixon's fear of losing his connection with his younger daughter, and Mr. Hixon's fear that his father would never meet M. – created a perfect storm that led Mr. Hixon to engage in behavior unlike anything he had ever done in his life.  The fear of separation, loss, and abandonment, combined with the incredibly strong love Mr. Hixon felt for his younger daughter and his father, caused him to engage in unlawful conduct designed, perhaps irrationally, to maintain his lifeline to them.

**B.**     **Mr. Hixon's Life Since His Arrest**

Mr. Hixon's life since his arrest has been a steep fall from its previous state.  As a result of his conduct, Mr. Hixon has been terminated from his employment at Evercore.  Upon his termination, Evercore retained over $6 million in combined salary, bonus, and unvested Evercore shares, compensation for work Mr. Hixon had already performed, and for which Evercore has profited handsomely.  As such, Mr. Hixon has already paid back the profits imputed from his insider trading several times over.  Mr. Hixon has also been sued by the Securities and Exchange Commission ("SEC") on civil insider trading charges.  He intends to settle that lawsuit, and as a result, will likely receive a lifetime bar from participating in the securities industry.  In short, his professional life in the securities industry as he knew it is over.

However, despite his arrest, guilty plea, and resulting restricted ability to travel, Mr. Hixon has, consistent with his history and character, remained a consistent and positive presence in the lives of his family and friends.  He has striven in particular to maintain the close contact he has always had with his younger daughter M. over her entire life, making sure to continue to see her regularly between the time of his arrest and sentencing (trips the Court has graciously permitted).

## II.     ARGUMENT

## THE COURT SHOULD IMPOSE A SENTENCE BELOW
## MR. HIXON'S CALCULATED GUIDELINES RANGE

The Probation Department's calculation of Mr. Hixon's sentencing guidelines range – 46-57 months – is consistent with the plea agreement and we do not contest that calculation. However, we contend that it is appropriate for the Court to impose a sentence below that range in this case because a review of the factors the Court must consider pursuant to Title 18 U.S.C. § 3553(a)(1) – (7) weighs in favor of such a disposition.  The mitigating factors borne out by the record here support a different, and lower, sentence than what the stipulated Guidelines range was intended to cover, *i.e.*, a typical insider trading case with true financial motive.

A.     A Review of the Section 3553 Factors Weighs in Favor of a Sentence Below Mr. Hixon's Calculated Guidelines Range

Title 18 U.S.C. § 3553 provides that the Court should impose "a sentence sufficient but not greater than necessary" to provide just punishment for the defendant, and requires the Court to consider "the nature and circumstances of the offense and history and characteristics of the defendant."  Pursuant to 18 U.S.C. § 3553, the Court must also consider the need for the sentence it imposes "to reflect the seriousness of the offense, [and] to promote respect for the law." 18 U.S.C. § 3553(a)(l) and (2)(A).  These sections of the Code direct the Court to consider the defendant, his life, and his actions holistically, and to "provide just punishment for the offense" in light of all the facts known to the Court.

1.     Seriousness of the Offense and History and Characteristics of the Defendant

Although Mr. Hixon's offense is serious, we respectfully submit that a sentence below his calculated Guidelines range will still promote respect for the law and provide just punishment, particularly in the circumstances presented by this case.  *See*, *e.g.*, *Gall v. United States*, 128 S. Ct. 586, 595-96 (2007) (even a probationary sentence imposes a significant restraint on the liberty of a defendant).  A sentence below the calculated Guidelines range can still have that effect given the distinct mitigating circumstances present here.  In fact, the seriousness of the offense should be measured by this particular defendant's offense conduct, not solely the generic offense of "insider trading," which, as we demonstrate below in comparing other cases, can be committed in varying manner and in varying forms of severity.  Moreover, the Sentencing Guidelines treat all insider trading offenses the same, in that they consider as

16

identical any violation of the statute generating a certain amount of trading profits as corresponding to a set amount of punishment, without regard to how that offense was committed, the financial motivations (or lack thereof) for committing the offense, and the other aggravating or mitigating circumstances.  In this regard, we respectfully submit that the four corners of the charging documents in this case, Mr. Hixon's plea allocution, and the PSR do not define Mr. Hixon, they only reveal a portion of the man, and during a confined and highly strained period of his life.  But the Court must sentence the whole person – taking into account Mr. Hixon's admitted criminal conduct in the context of his whole life.

Mr. Hixon's conduct and motivations are unlike those of the defendants in the vast majority of insider trading cases tried in this District Court.  Beginning with his childhood issues of loss and abandonment, and catalyzed by the terrible fears of losing his daughter and not being able to share her existence with his father, Mr. Hixon's particular and defining history and characteristics are absent from other insider trading cases: these differences serve to mitigate the seriousness of the offense.  They present an entirely different scenario from other cases where greed and status were motivating factors.

Moreover, Mr. Hixon's importance to his family unit, which will surely suffer without his presence, is also a factor the Court should take into account when it considers "the ... history and characteristics of the defendant."

**B.     Deterrence from Criminal Conduct**

The second factor listed in 18 U.S.C. § 3553(a)(2) is to "afford adequate deterrence from criminal conduct." 18 U.S.C. § 3553(a)(2)(B). This factor focuses on general deterrence of the public from committing criminal conduct of the type the defendant has engaged in.

Mr. Hixon submits that a sentence below his calculated Guidelines range, when considered together with the substantial collateral damage done to him by the prosecution of this case (the loss of significant income and the loss of his profession), will provide adequate general deterrence to the criminal conduct of others similarly situated to him.  *See United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (noting the ruined reputation of the defendant following his conviction as a deterrent).  The public humiliation of a felony conviction and the substantial loss of income Mr. Hixon has suffered to date and will likely continue to suffer for the rest of his life is another very serious punishment that will discourage others from doing as he did.  And the barrier to re-employment that results from his felony conviction and

17

inevitable bar from further activity in the securities industry is another heavy burden for Mr. Hixon that would tend to discourage others from committing the same crimes Mr. Hixon committed.

Further, recent studies have also indicated that general deterrence is better realized through the probability of punishment, rather than its length or severity in any one particular case.  *See*, *e.g.*, Richard A. Frase, *A More Perfect System: Twenty-five Years of Guidelines Sentencing Reform (Punishment Purposes)*, 58 Stan. L. Rev. 67, 80 (Oct. 2005) ("Research has found that offenders are more sensitive to the probability of punishment than to its severity. . .White-collar and regulatory offenders are more likely to be deterred, even by selective enforcement and modest penalties; such offenders have many lawful alternatives and much to lose from being convicted, regardless of the penalty."). *See also Adelson*, 441 F. Supp. 2d at 514 ("there is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders."), *and* United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing* (2004) (noting that the Sentencing Guidelines were written, in part, to "ensure a short but definite period of confinement for a larger proportion of these 'white collar' cases, both to ensure proportionate punishment and to achieve deterrence.").

Properly understood in context, Mr. Hixon's conduct is undeserving of the prison sentence of 46-57 months suggested by the Guidelines.  As such, a punishment below that level will not impair the deterrent effect Mr. Hixon's sentence will have on others because it will be seen as a proper deviation due to the different circumstances of the underlying behavior.  In these circumstances, we respectfully submit that the imposition of a lengthy sentence of incarceration on Mr. Hixon will not add any further weight to the general deterrence that this case already provides through the penalties Mr. Hixon has already suffered and the significant burdens he will be required to carry for the rest of his life as a result of his crime.

1.  <u>**Protection of the Public from Further Crimes of the Defendant**</u>

The third factor listed in 18 U.S.C. § 3553(a)(2)(C) requires to the Court to consider the need "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). Under the circumstances of this case, there is no period of incarceration that is necessary to provide sufficient *specific* deterrence to prevent Mr. Hixon from committing any further crimes. Mr. Hixon has learned that he must find a way to demonstrate love and support for his daughter through lawful, not unlawful, means.  In addition, as noted above, Mr. Hixon has already been

terminated from his position at Evercore, and will likely be barred from further activity in the securities industry.  These actions will prevent and also deter Mr. Hixon from committing similar crimes in the future.

Most importantly, the underlying conduct in this case was the result of a perfect storm whose arrival has changed the landscape, such that its recurrence is extremely remote.  The fact that Mr. Hixon felt he could not tell anyone about M., Ms. Robinson's unwillingness to take support in the form of checks, Mr. Hixon's fear of losing M., Mr. Hixon's father's deteriorating health, and the stress borne of dealing with all that and more led Mr. Hixon to do things completely unlike him, as is clear from the many letters of support received from his friends, family, and business associates.  We respectfully submit that the circumstances that led Mr. Hixon to commit the crimes that bring him before the Court are unlikely to recur, and therefore there is scant risk that Mr. Hixon will become a recidivist.

2. **Avoidance of Unwarranted Sentence Disparities**

Title 18 U.S.C. § 3553(a)(6) also requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  A comparison of the circumstances and sentences in other, relatively recent cases involving insider trading illustrates both that (1) others have engaged in objectively more egregious conduct and received lower sentences and (2) to the extent higher sentences were imposed in other cases, the mitigating factors that are present for Mr. Hixon did not exist in those cases.  A sentence below Mr. Hixon's calculated Guidelines range is therefore appropriate.  The imposition of such a sentence on Mr. Hixon will certainly be consistent with the below-Guidelines punishments imposed on other defendants with higher gains, more extensive misconduct, and behavior motivated by financial greed alone.

For example, Drew Brownstein purchased stock in Mariner Energy after learning from a friend whose father was on the board of the company that the company could be an acquisition target.  *See United States v. Brownstein*, No. 11 Cr. 904 (RPP), Information (Dkt. No. 6) (S.D.N.Y. October 21, 2011).  Brownstein's profit of $2.4 million is more than three times the amount of profit in Mr. Hixon's case, but Brownstein was sentenced in January 2012 to one year and one day in prison, more than two-thirds below the advisory Guidelines range of 37-46 months he faced.  *See Brownstein*, No. 11 Cr. 904, Order of Forfeiture (Dkt. No. 14) (S.D.N.Y. January 17, 2012) and Judgment (Dkt. No. 15) (S.D.N.Y. January 18, 2012).

Doug Whitman, the owner and manager of a $100 million hedge fund, was convicted after trial of trading on inside information from multiple sources over a period of years. His Guidelines range was 51 to 63 months based on a gain of $935,306. *See United States v. Whitman*, No. 12 Cr. 125 (JSR), Judgment (Dkt. No. 122) (S.D.N.Y. January 29, 2013). Judge Rakoff, despite his expressed certainty that Whitman had perjured himself at trial, nonetheless sentenced Whitman to 24 months, based in large part on his view of Whitman's total character. He distinguished between a defendant whose Guidelines calculations may have been the same, but who was instead a "grasping, evil, crooked, despicable human being" and Whitman, who was "basically a good person but has made some intentional mistakes." *See Whitman*, No. 12 Cr. 125 (JSR), Sentencing Transcript at 5, 28 (S.D.N.Y. January 24, 2013).

Donald Longueuil, an SAC Capital employee, participated in a large insider trading conspiracy that spanned numerous hedge funds. Longueuil's crimes were integral to his professional activities – criminal activity appeared to be a large part of his job. He personally gained between $1,000,000 and $2,500,000 from insider trading, and had a calculated Guidelines range of 46-57 months. *See United States v. Longueuil*, No. 11 Cr. 161 (JSR), Complaint (Dkt. No. 1) (S.D.N.Y. February 7, 2011), but was sentenced to only 30 months' incarceration and two years' supervised release. See Longueuil, No. 11 Cr. 161, Judgment (Dkt. No. 112) (S.D.N.Y. August 10, 2011).

Danielle Chiesi, a hedge fund trader involved in the Galleon scandal, earned her hedge fund $1.7 million from insider trading and shared inside information with her supervisor, so that their hedge fund could take even larger positions in stocks than Chiesi was authorized to take on her own. *See United States v. Chiesi*, No. 09 Cr. 1184 (RJH), Complaint (Dkt. No. 1) (S.D.N.Y. October 15, 2009). Chiesi was sentenced to 30 months, though the calculated guidelines ranged from 37 to 46 months. Along with the 30-month prison term, Ms. Chiesi was sentenced to two years of supervised release, 250 hours of community service, a $25,000 fine and mandatory mental health and alcohol treatment. She had previously agreed to pay the Securities and Exchange Commission $540,000. *See Chiesi*, No. 09 Cr. 1184 (RJH), Judgment (Dkt. No. 303) (S.D.N.Y. August 9, 2011).

James Gansman, a former partner at accounting firm Ernst & Young LLP, was convicted after a jury trial on six securities fraud counts. *See United States v. Gansman*, No. 08 Cr. 471 (MGC), Judgment (Dkt. No. 42) (S.D.N.Y. February 25, 2010). The Government alleged that,

over at least a two-year period, Gansman tipped a woman with whom he was having an affair about potential mergers and acquisitions involving Ernst & Young's clients.  *Gansman* No. 08 Cr. 471, Indictment (Dkt. No.1) (filed May 27, 2008). The woman made approximately $390,000 on the illegal tips, which was attributed to Gansman.  Although the resulting Guidelines range was 33-41 months, Judge Cedarbaum imposed a non-Guidelines sentence of one year and one day, plus six months of supervised release. (Gansman No. 08 Cr. 471, Judgment (Dkt. No. 42) (filed February 25, 2010).  Mr. Hixon's circumstances compare favorably with the foregoing defendants, and indicate that a below-Guidelines sentence is appropriate to avoid unwarranted disparities with their sentences.

Mr. Hixon's offenses are also atypical of the current "Galleon era" of insider trading cases, where defendants have usually stood accused of abusing their positions of trust in order to obtain unfair advantages over colleagues and competitors, and to inflate their trading profits and reputation.  As trial evidence revealed, the practices at Raj Rajaratnam's Galleon Group regularly involved insider trading as a means to beat the competition, with large numbers of employees constantly trading pieces of confidential information to gain unfair advantages.  *See United States v. Rajaratnam et al*, No. 09 Cr. 1184 (RJH), Government's Sentencing Memorandum (Dkt. No. 284) (filed June 13, 2011).  Mr. Hixon's occasional trades to maintain contact with his younger daughter cannot be considered reasonably similar to that calculated cultivation of corrupt relationships with insiders motivated by increased trading profits.

Rajat Gupta, himself connected to Rajaratnam, was convicted after trial for his violation of boardroom confidences and use of the information he learned as a Director to help Rajaratnam and others at Galleon make millions of dollars in illegal profits.  S*ee United States v. Gupta*, No. 11 Cr. 907 (JSR), Judgment (Dkt. No. 128) (S.D.N.Y. November 9, 2012).  Gupta's calculated Guidelines range was 97 to 121 months' imprisonment, but he was sentenced to 24 months.

Further, Todd Newman, a portfolio manager at Diamondback Capital, was an integral member of a group of as many as 10 portfolio managers, analysts and insiders at technology companies who swapped inside information, and was convicted of trading and profiting on information gained from an analyst whom he employed, gaining a total of $70 million.  *See United States v. Newman et al*, No. 12 Cr. 121 (RJS), Indictment (Dkt. No. 26) (filed February 7, 2012) and Judgment (Dkt. No. 263) (filed May 9, 2013).  Although his guideline range was 63-78 months, Newman received a 54 month sentence.  *Id.*

Again, Mr. Hixon's offenses pale in comparison to the pervasive, calculated and economically-driven conduct of defendants such as Rajaratnam, Gupta and Newman. Sentencing Mr. Hixon below his calculated Guidelines range is thus necessary to avoid an unwarranted sentence disparity with these other defendants.

3.     **Restitution to Victims of the Offense and Financial Considerations**

Finally, 18 U.S.C. § 3553(a)(7) requires the Court to consider "the need to provide restitution to any victims of the offense."  Although insider trading offenses are considered to be a "fraud on the market" with no direct victim, Mr. Hixon has agreed to forfeit an amount equal to the profits from the charged trading totaling $710,000.  In addition, Mr. Hixon expects to pay an amount of restitution to his former employer, Evercore, that will consist of a combination of the costs of the internal investigation and cooperation with the government and a portion of his compensation during the years in which the offense was committed.  We expect that the amount of this restitution will be finalized by the time of sentencing and we will so inform the Court. This restitution payment is on top of and does not include the more than $6 million in combined earned salary, bonus, and unvested Evercore shares that Evercore retained upon Mr. Hixon's termination from Evercore.  In addition, as noted above, Mr. Hixon expects to resolve the SEC's civil charges by consenting to injunctive relief and paying disgorgement.[3]

Regarding the possibility of a criminal fine, in a number of other recent insider trading cases, no criminal fine was imposed.  *See, e.g.*, *United States v. Emanuel Goffer*, No. 10 Cr. 56 (RJS), Sentencing Transcript at 28 (S.D.N.Y. Oct. 7, 2011); *United States v. Kurland*, No. 10 Cr. 69 (VM), Sentencing Transcript at 51 (S.D.N.Y. May 21, 2010); *United States v. Drimal*, No. 10 Cr. 56 (RJS), Sentencing Transcript at 54 (S.D.N.Y. Aug. 31, 2011).  Under 18 U.S.C. § 3572(a)(5), courts are required to consider the "need to deprive the defendant of illegally obtained gains," but Mr. Hixon will already be required to forfeit $710,000 as a result of this case, and will also be required to pay between $1,190,000 and $1,900,000 to the SEC, depending on whether any offset credit for criminal forfeiture is given to him by that agency.  *See, e.g.*, *United States v. Madden*, No. 09 Cr. 799 (RWS), 2011 WL 4359933, at *9 (S.D.N.Y. Sept. 19, 2011) ("In consideration of the significant amount of restitution and forfeiture Defendant will be

---

[3]     The SEC has requested payment of $1,900,000 from Mr. Hixon, consisting of $950,000 in disgorgement and $950,000 as a one-time penalty.  We are seeking an offset of $710,000 in consideration of the criminal forfeiture Mr. Hixon will pay in the instant case.

paying, the fine in this case shall be waived.").  We respectfully submit that in light of the amount of earned compensation that Evercore retained, the amount of restitution that Mr. Hixon has agreed to pay to Evercore, the forfeiture in this case, and the financial components of Mr. Hixon's expected resolution with the SEC, a fine is unnecessary.

* * *

Based on all of the foregoing, we respectfully submit that consideration of the relevant factors set forth in Title 18 United States Code Section 3553(a) should result in  a sentence below Mr. Hixon's calculated Guidelines range of 46 to 57 months.  A sentence below that range is sufficient to achieve the mandates of Section 3553(a), and a higher sentence would be greater than necessary for that purpose.   Mr. Hixon's criminal conduct was a clear aberration amid a life full of examples of his true character -- compassion, support, parenting, friendship, professional integrity, and most of all, love of family.  A temporary lapse of judgment to attempt to preserve a relationship with a cherished and loved young child should not result in punishment prescribed for insider trading offenses committed for typical reasons.  This is no typical case.  We respectfully request that the Court give Mr. Hixon a chance to continue to develop that deep bond with M. that has helped her to thrive and that has begun to put this collective family back on track again.  Mr. Hixon's wife Marguerite makes this last point clear:

> It is a particularly harsh aspect of this process that it demands that we revisit a private and painful time in our life together – and do so in a public forum.  When Perk told me the story of M., hard as that time was, it was clear to both of us that we wanted to go forward together.

> Children are not to blame for the mistakes of their parents, and there is no reason that M. should suffer for the mistakes of hers.  Children need family: there was no question in my mind that we, and our extended family, would ultimately be part of M.'s extended family; and that we would provide support to her, both financial and emotional, including Perk spending time with her in Austin.

> * * *

> I know that Perk deeply regrets the actions that have brought him before you, and that he is embarked on the hard work necessary to rectify them.  I respectfully ask that in your decision, you allow him – and all of us – to continue that process.

Letter of Marguerite ███████, attached as Exhibit 2.

23

## CONCLUSION

For all the foregoing reasons, Frank Perkins Hixon, Jr. respectfully requests that the Court impose on him a sentence below his calculated Guidelines range.

Dated: New York, New York
July 18, 2014

KING & SPALDING LLP

By: _____

WILLIAM F. JOHNSON (WJ-3064)
1185 Avenue of the Americas
New York, New York 10036-4003
Telephone: 212-556-2125
Fax: 212-556-2222

*Attorneys for Defendant Frank Perkins Hixon, Jr.*